UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>(1) JAMES GARRETT, (2) LEVI GARRETT,<br><br>Defendant. | 3:21-CR-30091-RAL<br><br><br>OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL |

After a six-day trial, a jury found Defendant James Garrett guilty on two counts (Counts IV and VI) of False Statement in connection with Federal Crop Insurance and found Defendant Levi Garrett guilty of one count (Count V) of False Statement in connection with Federal Crop Insurance. The jury found the Defendants not guilty on several other counts. Defendants James Garrett and Levi Garrett (collectively the Garretts) have filed a Motion for Judgment of Acquittal and in the Alternative for New Trial. Doc. 109. That motion distills into two arguments: (1) an assertion of insufficient evidence to support conviction on any counts; and (2) a counter-factual claim debunked by the transcript that this Court misread the verdict form by inverting the names of the defendants when reading the verdict on Count VI, which in the Garretts' view justifies acquittal because the polling of the jury confirmed the verdict as read by this Court to be unanimous. Doc. 109; Doc. 110. For the reasons explained, the Motion for Judgment of Acquittal and in the Alternative for New Trial is denied.

1

I.      **Facts Relevant to Counts of Conviction**

Defendant James Garrett (James) is the father of Defendant Levi Garrett (Levi). The Garretts operate a farm and ranch in Sully County, South Dakota. Because the counts of conviction involve false statements in connection with crop insurance for plantings in 2018 and 2019, this Court will focus on facts relating to those crop years.

The Garretts participated in the federal crop insurance program during the relevant years. For 2018, James certified on his acreage report that he planted 1,152.22 insured acres of sunflowers between June 10 and June 16, 2018. Tr. Ex. 4. For 2018, Levi certified on his acreage report that he planted 1,122.79 acres of sunflowers between June 10 and June 16, 2018. Tr. Ex. 5. Both James and Levi signed their separate acreage reports just below the following certification statement:

> I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. § 1006 and § 1014; 7 U.S.C. § 1056; 31 U.S.C. § 3729, and § 3730 and any other applicable federal statutes.).

Tr. Exs. 4–5. These acreage reports are for a federal crop insurance program administered by Crop Risk Services for the Risk Management Agency, which is a federal agency within the United States Department of Agriculture.

The Department of Agriculture establishes a date by which a crop must be planted for full crop insurance coverage. A farmer may still obtain coverage for crops planted after the established plant date, but there is discount in the reimbursement for such crops and a final cutoff date beyond which no crop insurance is available. The established 2018 plant date for full insurance coverage for a sunflower crop in Sully County, South Dakota, was June 20, 2018. See Tr. Ex. 108. The

2

dates of planting sunflowers certified by the Garretts in 2018 were before the established plant date for sunflowers in Sully County.

The Garretts had purchased seed in a previous year from Pinnacle Agriculture on credit but failed to pay for the seed or spraying services supplied by Pinnacle Agriculture and instead filed a bankruptcy case. Pinnacle Agriculture refused to sell seed to the Garretts on credit in 2018.

The only evidence that the Garretts acquired sunflower seed to plant in 2018 was from Sioux Nation, LLC. Sioux Nation, LLC employees kept a contemporaneously made handwritten log on a legal pad of when farmers bought seed. On a page that begins with the date "6-20-18," Sioux Nation, LLC on the third entry on the page recorded that James bought eight pallets of sunflower seed, and across from that entry "Del made 6-22-18" is written. Tr. Ex. 52 at 1. Three lines below that entry the date "6-22-18" is written across from another entry. Id. Sioux Nation, LLC invoiced James for the sunflower seed purchased on June 21, 2018. Tr. Ex. 53. Thus, in 2018 James bought eight pallets of sunflower seed no earlier than June 20 and received delivery no later than June 22, according to the records and testimony of the Sioux Nation, LLC witness. So, even though the Garretts certified planting sunflowers between June 10 and 16, 2018, their purchase of sunflower seed could have been no earlier than June 20, 2018.

Six Sully County farmers whose properties border that of the Garretts—Brienne Sandal, Tim Stampe, Tom Young, Sam Braun, Jeff Bush, and Jerry Bush—testified that between 2016 and 2020 the Garretts habitually planted late or not at all. See Tr. Ex. 96. Each testified about how they were out in their fields adjacent to the Garrett land between May and July of each year and could observe the activity, or rather lack of activity, on the Garrett land. Many of these neighboring farmers testified to chronic weed issues from the idle or late planted Garrett land.

3

One of the fields certified by the Garretts as having been planted to sunflowers between June 10 and 16, 2018, was the subject of a spray drift complaint in July 2018. A neighbor of the Garretts reported spray drift from Garrett land onto a corn crop, prompting a state investigator to visit the site, take photographs, and obtain the record of spraying of the Garretts' field. The spray records produced by Levi documented that he had sprayed a field with the herbicide paraquat dichloride on July 6, 2018; that field had been certified as having been planted in June to sunflowers. See Tr. Exs. 64, 68. An agronomist testified at trial that spraying paraquat dichloride would kill any sunflowers. A photograph showing the Garrett field taken by the investigator of the spray drift claim in early August 2018 reflected dying weeds and not a field of sunflowers ostensibly planted in June 2018. Tr. Exs. 65–67. There was some evidence that the Garretts planted sunflowers later in 2018 on their lands, likely following the spraying by Levi in July 2018 under a no-till method, which would have killed weeds to give a late-planted sunflower crop a chance to emerge. The Garretts received full crop insurance benefits for the 2018 sunflowers as if their sunflower fields were timely planted as the Garretts had represented.

In 2019, most of the Garretts' lands were in a prevent-plant status. After a discussion with their crop insurance agent, James chose to report planting 22.5 acres of corn in one field and 25 acres of corn in another; such a planting would have the effect of reducing the crop insurance premiums. James signed his 2019 acreage report for federal crop insurance on July 12, 2019, certifying that he planted 47.5 acres of corn on June 17, 2019. Tr. Ex. 6. The Certification Statement read:

> I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. § 1006 and § 1014; 7 U.S.C. § 1056; 31 U.S.C. § 3729, and § 3730 and any other applicable federal statutes.).

4

Tr. Ex. 6 at 20. James's 2019 Program Year United States Department of Agriculture Map (2019 FSA map) was initialed "JG" in handwriting that matched James's signature. Tr. Exs. 1, 3, 6–7. The 2019 FSA map showed where the 22.5 and 25 acres of corn ostensibly had been planted. Tr. Ex. 23.

On July 27, 2019, unbeknownst to the Garretts, an insurance adjuster for Crop Risk Services named Barry Jennings went to view the fields James had ostensibly planted to corn. Jennings used the 2019 FSA map initialed by James to locate where corn purportedly was planted. At both locations, Jennings viewed fields that not only had no corn planted, but also were full of weeds and not prepared to plant. Jennings notified his supervisor Mark Opp of this discrepancy. Unbeknownst to the Garretts, Jennings returned to the Garrett land with Opp on September 26, 2019, finding no corn planted and weeds that were waist-to-chest-high in places. Photographs, notes, and a video from the visits verified Jennings's and Opp's testimony. Tr. Exs. 23, 74–76.

On October 11, 2019, Opp informed James that he wanted to see the fields reportedly planted to corn. On October 22, 2019, Opp and Jennings met with Levi and were taken to two locations on the Garrett land where corn supposedly had been planted. Both locations had been recently tilled and corn stover[1] had been spread atop the area plowed. Both Jennings and Opp have farm backgrounds and testified that corn had not been harvested and disced on the sites. Indeed, one of the sites overlapped with an area Jennings had visited twice and Opp once and had photographed and videotaped as being weed filled and devoid of corn two weeks earlier. One location Levi showed did not correspond with where corn was claimed to be planted on the 2019

---

[1] "Corn stover," as used by Opp and Jennings, means the debris of stalks and hulls of a corn crop that typically comes out of the discharge end of a combine that is harvesting corn. Photographs of the sites show corn stover spread atop the disced area and do not show, for instance, remnants of root balls from corn plants. Tr. Exs. 74–76.

5

FSA map, while the other location overlapped but did not quite match where the 2019 FSA map showed James planted corn. The evidence was ample to show no planting of corn in 2019 at either site, and a ruse by the Garretts to try to convince the adjusters that corn had been planted and then disced under after harvest.

James did not testify at trial. Levi testified that sunflowers were timely planted in 2018, that the spray record information he gave the state investigator in 2018 was mistaken because he sprayed earlier in the year, and that 47.5 acres of corn were planted and harvested in 2019 in the areas he showed the adjustors. The jury evidently, and for good reason, chose not to credit that testimony from Levi.

## II.     Discussion of Grounds Raised in the Garretts' Motion

### A. Standard for Granting Judgment of Acquittal or New Trial

"A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." United States v. Dupont, 672 F.3d 580, 582 (8th Cir. 2012) (per curiam) (quoting United States v. Boesen, 491 F.3d 852, 855 (8th Cir. 2007)). In ruling on a motion for judgment of acquittal, the court must view the evidence "in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." Id. (quoting United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006)). Of course, "a jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony." United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010).

The standard for a new trial under Rule 33 of the Federal Rules of Criminal Procedure is different. Rule 33 allows the court to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). When evaluating a motion for a new trial claiming

insufficient evidence, "the district court is not required to view the evidence in the light most favorable to the verdict; instead, [it] may weigh the evidence and judge witness credibility for itself." United States v. Clayton, 787 F.3d 929, 935 (8th Cir. 2015). However, a "jury's verdict must be allowed to stand unless the evidence weighs heavily enough against the verdict such that a miscarriage of justice may have occurred." Id. (cleaned up and citation omitted); see United States v. Stacks, 821 F.3d 1038, 1044 (8th Cir. 2016) ("Motions for new trials based on the weight of the evidence are generally disfavored."). The power of the court to grant a new trial should be invoked only in an exceptional case where the evidence preponderates heavily against the verdict. United States v. Starr, 533 F.3d 985, 999 (8th Cir. 2008). "As a general rule, the decision whether to grant or deny a motion for a new trial lies within the discretion of the district court." United States v. McMahan, 744 F.2d 647, 652 (8th Cir. 1984). Such authority, however, "should be exercised sparingly and with caution." United States v. Cole, 537 F.3d 923, 926 (8th Cir. 2008) (cleaned up and citation omitted).

### B. Sufficiency of Evidence

The Garretts were convicted on counts of False Statement in connection with Federal Crop Insurance in violation of 18 U.S.C. § 1014, with James convicted on Counts IV and VI, and Levi convicted on Count V. Counts IV (involving James) and V (involving Levi) relate to the 2018 false statements involving sunflowers ostensibly being planted before the final plant date. The statute prohibiting False Statement in connection with Federal Crop Insurance provides:

> Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the . . . Federal Crop Insurance Corporation or a company the Corporation reinsures, . . . upon any application . . . or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

7

18 U.S.C. § 1014.

> No party objected to the instruction about the elements of Count IV which were:
>
>> ***One***, that on or about the 6th day of July, 2018, the defendant, James Garrett, knowingly made a false statement that he planted 1,115.22 insured acres of sunflowers between the 10th day of June, 2018, and the 16th day of June, 2018, to Crop Risk Services.
>>
>> . . .
>>
>> ***Two***, that James Garrett made the false statement for the purpose of influencing the action of Crop Risk Services upon making a claim that the insured acres of sunflowers were lost when less than that amount of sunflowers were in fact planted.
>>
>> ***Three***, that Crop Risk Services was re-insured by Federal Crop Insurance Corporation at the time the statement was made.

Doc. 94 at 10. Likewise, no party has disputed that the jury received proper instructions on the elements of Count V, which were:

> ***One***, that on or about the 6th day of July, 2018, the defendant, Levi Garrett, knowingly made a false statement that he planted 1,122.79 insured acres of sunflowers between the 10th day of June, 2018, and the 16th day of June, 2018, to Crop Risk Services.
>
> . . .
>
> ***Two***, that Levi Garrett made the false statement for the purpose of influencing the action of Crop Risk Services upon making a claim that the insured acres of sunflowers were lost when less than that amount of sunflowers were in fact planted.
>
> ***Three***, that Crop Risk Services was re-insured by Federal Crop Insurance Corporation at the time the statement was made.

Doc. 94 at 11. The evidence presented at trial was sufficient to establish all of the elements of False Statement in Connection with Federal Crop Insurance as charged in Counts IV and V.

The evidence on Counts IV and V had substantial overlap; though this Court has considered the sufficiency of the evidence on each conviction separately, it makes sense to discuss the

evidence once to avoid repetition in this opinion and order. The Garretts raise no issue about sufficiency of the evidence that they made statements about having planted sunflowers between June 10 and 16, 2018 and obviously they made such statements. Tr. Exs. 4–5. The Garretts argue that the evidence was insufficient to show that their statements were false as required in the first element and in the second element of the offenses. The Garretts do not contest that the third element is satisfied. After all, these statements were made to Crop Risk Services, which was reinsured by Federal Crop Insurance Corporation, a federal agency within the United States Department of Agriculture.

Contrary to the Garretts' arguments, there was sufficient evidence to establish that the Garretts' acreage reports about when they planted sunflowers contained a false statement made for the purpose of influencing the action of the federal crop insurer. The Garretts both listed plant dates for sunflowers as being between June 10 and 16, 2018, which are shortly before the 2018 final plant date for sunflowers in Sully County. The only evidence of the Garretts purchasing sunflower seed for planting in 2018 was from Sioux Nation, LLC. The Garretts had been cut off from purchasing from their prior seed dealer for failing to pay for seed and spraying services. Sioux Nation, LLC kept a log of seed sales, reflecting that James bought eight pallets of sunflower seed on June 20, 2018, with "Del made 6-22-18" and with an invoice dated June 21, 2018. Tr. Exs. 52–53. A Sioux Nation, LLC representative testified about the log, which was made contemporaneous with purchases and shows that the earliest possible date when the Garretts could have taken the seed was June 20, with the probable date of June 22, 2018. In short, the Garretts could not have planted sunflowers between June 10 and June 16, 2018, because they had not yet purchased the seed. Bolstering this evidence was the testimony of the neighbors of the Garretts about the Garretts routinely leaving fields fallow and full of weeds well into the summer. Indeed,

six farmers whose properties abut Garrett land testified that between 2016 and 2020, the Garretts habitually planted late and between the months of May and early July they did not see the Garretts timely plant crops on their lands.

Beyond that, there was testimony from a neighbor who reported a spray drift issue in July 2018 from land that the Garretts represented to be planted to sunflowers in June 2018 and from a state investigator who inspected the area and took photographs in early August 2018. Levi produced spray records showing that he sprayed the herbicide paraquat dichloride on July 6, 2018, Tr. Ex. 64, which is toxic to sunflowers. Photographs showing part of the Garrett field ostensibly planted to sunflowers document the absence of any sunflower crop at that time. Tr. Exs. 65–67. The August 2018 photographs depicting part of the Garrett land show dying weeds, not dying sunflowers. While it appears that the Garretts eventually planted some sunflowers, the July 6, 2018 spraying of paraquat dichloride, a jury reasonably could conclude, was to kill weeds to then plant a late no-till crop of sunflowers. The jury did not have to accept Levi's explanation that he copied the date on which he sprayed incorrectly or defense counsel's efforts to confuse, combined with Levi's later testimony, that Sioux Nation, LLC's records cannot be trusted.

Thus, there was ample evidence for the jury to conclude that the Garretts falsely represented when they planted sunflowers in 2018 and did so for the purpose of influencing the crop insurer. Similarly, the evidence does not weigh against the verdict to the point a miscarriage of justice has occurred. Indeed, the Garretts later collected a full crop insurance payment for a failed sunflower crop, notwithstanding the evidence that the sunflowers were planted after the June 20, 2018 established plant date. Nevertheless, the Garretts argue that their convictions concerning Counts IV and V are "entirely based on circumstantial evidence" regarding the reliability of the Sioux Nation, LLC log. Doc. 110 at 8. The testimony of the Sioux Nation, LLC witness renders

the log to be more than merely circumstantial, and circumstantial evidence can be sufficient to justify a conviction. See McFadden v. United States, 576 U.S. 186, 192 n.1 (2015) (giving examples of direct and circumstantial evidence). Indeed, neither party objected to this Court giving the Eighth Circuit pattern instruction that: "You are instructed that you should not be concerned with [the terms 'direct evidence' and 'circumstantial evidence.'] The law makes no distinction between direct and circumstantial evidence. You should give all evidence the weight and value you believe it is entitled to receive." Doc. 82 at 5; Eighth Cir. Pattern Inst. 1.03; Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (stating that circumstantial and direct evidence are treated alike and "that juries are routinely instructed that the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence." (cleaned up and citations omitted)); Holland v. United States, 348 U.S. 121, 140 (1954) (observing that, in criminal cases, circumstantial evidence is "intrinsically no different from testimonial evidence"); Mo. Nat'l Educ. Ass'n v. New Madrid Cnty. R-1 Enlarged Sch. Dist., 810 F.2d 164, 167 (8th Cir. 1987) (describing such an instruction as a "general jury instruction."). Thus, the motion for judgment of acquittal or a new trial as to Counts IV and V is denied.

For James's conviction on Count VI involving the 2019 false statement in connection with crop insurance, the elements were not disputed and are:

> ***One***, that on or about the 12th day of July, 2019, the defendant, James Garrett, knowingly made a false statement that he planted 47.5 insured acres of corn the 17th day of June, 2019, to Crop Risk Services.
>
> . . .
>
> ***Two***, that James Garrett made the false statement for the purpose of influencing the action of Crop Risk Services upon making a claim that the insured acres of corn were lost when less than that amount of corn was in fact planted.

> ***Three***, that Crop Risk Services was re-insured by Federal Crop Insurance Corporation at the time the statement was made.

Doc. 94 at 12. The evidence presented at trial satisfies all three elements of False Statement in Connection with Federal Crop Insurance as charged in Count VI.

Like with Counts IV and V, James's argument centers on the sufficiency of evidence of any false statement in connection with crop insurance. There is no question that James made the representation on his 2019 acreage report regarding crop insurance that he planted 47.5 acres of corn on June 17, 2019. Tr. Ex. 6. The statements were made to Crop Risk Services, who was reinsured by the Federal Crop Insurance Corporation, a government agency, thus satisfying the third element of the offense. James's initials in his handwriting then appear on his 2019 FSA Map showing where the 22.5 and 25 acres of corn were ostensibly planted. Tr. Ex. 23.

There is sufficient evidence to show that the statement about planting 47.5 acres of corn in 2019 was false and made to influence the actions of Crop Risk Services, as the planting of such an amount would reduce the crop insurance premium that James would owe. While most of James's farmland in 2019 was not planted with a claim for prevent planting made and paid, the 2019 FSA map shows where the two small fields of corn ostensibly were planted. These two small fields were visited three separate times by adjuster Jennings after the certified plant date, twice without the Garretts being there or being aware, and once with Levi as the guide. The two unannounced visits to the locations certified on the 2019 FSA map showed the fields were both not planted with corn and full of weeds. In September, Jennings returned with his supervisor, Opp, to the certified fields, finding waist-to-chest-high weeds in places and no sign of corn. Opp and Jennings took photographs, notes, and a video of the fields where corn purportedly had been planted. Tr. Exs. 23, 74–76. In October, eleven days after Opp alerted James that he intended to visit to see the areas planted to corn, Levi met Opp and Jennings and took them to James's fields where corn

supposedly had been planted. One of the fields did not correspond to where the 2019 FSA map showed corn to be planted and the other overlapped with the pictures of chest-high weeds taken in September. However, on the October visit, the weeds had been disced under and corn stover spread over the newly disced soil to attempt to give the appearance of corn having been harvested and then disced under. Knowing that just a few weeks previously, no corn had stood in one of the areas shown them by Levi, Jennings and Opp, both experienced in farming, realized that they were looking at stover spread over the newly-disced field as part of a ruse by the Garretts to try to convince the adjusters that corn had been planted and then disced under. Indeed, a review of the October pictures showed no remnants of root balls of the allegedly planted corn. The representation of corn being planted was made to induce Crop Risk Services to lower James's insurance premiums for the 2019 season. Thus, the false statement was made to affect the actions of Crop Risk Services. Therefore, the evidence was sufficient on all elements of Count VI.

The evidence supports a reasonable jury finding James guilty of the crime, so a judgment of acquittal would be improper. Similarly, the evidence does not weigh against the verdict to the point a miscarriage of justice has occurred. Thus, the motion for judgment of acquittal or a new trial as to James's conviction of Count VI is denied.

### C. Claim of Error Polling the Jury

As an apparent last-ditch attempt to have a new trial granted, Garretts argue that this Court misread the verdict form, incorrectly naming Levi Garrett as being convicted of Count VI of the superseding indictment despite not being charged in that count. Doc. 110 at 3. Defense counsel submitted affidavits saying that they took notes as the verdict form was read, "specifically wr[iting] down the name and the count for each count" and that they heard Levi was convicted of Count VI. Doc. 111 at 1–2; Doc. 112 at 1–2. According to the identical affidavits signed by both defense

attorneys, "[i]mmediately following the excusing of the Jury, a discussion was held with Levi Garrett, Michael S. Beardsley and Steven C. Beardsley regarding Count VI. All three of [them] heard the Court read the verdict form indicating that Levi Garrett, not James Garrett was guilty of Count VI." Doc. 111 at 2; Doc. 112 at 2. Defendants assert that there was "no opportunity to correct" the error they believe they heard. Doc. 110 at 3. Defendants further assert that because Levi Garrett was not charged in Count VI, the subsequent polling of the jury confirming their unanimous verdict means that neither James nor Levi could be found guilty of Count VI because of the alleged error and the lack of opportunity to correct it.

The transcript of the taking of the verdict contradicts the Garretts' assertions. Indeed, in their motion, the Garretts admit there is no evidence of an actual misreading, stating: "[a]fter review of the transcript, the error was not identified." Doc. 110 at 3. The transcript clearly demonstrates that this Court read the verdict form as follows: "Number 6. We find the defendant *James Garrett*, guilty of Making a False Statement in Connection with Federal Crop Insurance as charged in Count VI of the superseding indictment." Doc. 109-1 at 4 (emphasis added).

The verdict form also shows that James Garrett was properly listed as the defendant in Count VI. Doc. 95 at 1. The jury was then polled, and each juror separately agreed that it was their verdict. Doc. 109-1 at 6. Defense counsel made no objection during the reading of the verdict form or thereafter to seek clarification or attempt to correct any error they believe was made. In fact, afterward this Court asked: "Is there anything further from the Defendants before we terminate the case—the trial, that is, Mr. Beardsley?" Doc. 109-1 at 8. Mr. Michael Beardsley replied "No, Your Honor" at first, but then asked about post-jury verdict motions. Id. After explaining this Court's standard practice, this Court asked, again, "So then anything further from

the Defendants, Mr. Beardsley?" to which Mr. Michael Beardsley again replied, "No, Your Honor." Doc. 109-1 at 9.

The official record is the transcript and not what counsel and clients believe, or perhaps wishfully think, that they heard. Jones v. Nat'l Am. Univ., No. CIV. 06-5075-KES, 2009 WL 949189, at *1 (D.S.D. Apr. 4, 2009) ("The court finds this transcript is the official record of the trial."); Townes v. Alabama, 139 S. Ct. 18, 20 (2018) (mem.) (finding that the "transcript is now the official record of the trial court proceedings."); see also Miller-El v. Dretke, 545 U.S. 231, 276 (2005) (Thomas, J., dissenting) ("The *voir dire* transcript was part of the official record."); 28 U.S.C. § 753(b) ("The transcript in any case certified by the reporter or other individual designated to produce the record shall be deemed prima facie a correct statement of the testimony taken and proceedings had. No transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."). Thus, while defense counsel stated they felt they "must take this position," it appears that they simply misheard the Court read the verdict correctly. Because the official record indicates that this Court correctly indicated that James was found guilty of Count VI and that Levi's name was not read in his stead this argument must fail.

This Court is aware that it operates in an era of people believing what they want to believe, indeed at times counterfactual information, regardless of what the facts are. There exists a way to verify whether the official record or what is asserted in the affidavits of counsel is true. There is a recording system known as For the Record (FTR) which may have captured what was said when this Court took the verdict. The FTR audio by Local Rule is "not released to parties or the public." D.S.D. Crim. LR 57.2. The District of South Dakota has previously considered what happens when the transcript is different than what counsel or parties recollect:

15

> Here, the trial was officially recorded verbatim by shorthand by a court reporter hired by the court. The court reporter followed her usual procedure by using a stenotype to document all statements made during the trial. She later transcribed her notes into the trial transcript and filed it with the court. The court finds this transcript is the official record of the trial. The court also utilized the For The Record (FTR) recording system during the trial, which is a digital recording made during court proceedings when a court reporter is not available or necessary. See http://fortherecord.com. But because the court reporter produced the official record in this case, the court finds that FTR was a back up recording device for court use only. See Emmel v. Coca–Cola Bottling Co. of Chicago, Inc., 904 F. Supp. 723, 752 (N.D. Ill. 1995).

Jones, 2009 WL 949189, at *1. As such, the official transcript controls and counsels' belief about what they heard does not justify acquittal or a new trial.

The Local Rule recognizes that "[i]f a proceeding has been recorded electronically and the electronic recording constitutes the official record, the clerk of court will arrange . . . to have a transcript prepared from the electronic recording." D.S.D. Crim. LR 57.2. In brief, FTR exists to allow this Court to conduct hearings in the absence of a court reporter, which sometimes is required given the dearth of court reporters and need for hearings to occur on short notice regardless of court reporter availability. This Court intends to begin the sentencing hearing by having the FTR recording of the taking of the verdict played in open court for all to hear. If there is any discrepancy between the official transcript and the FTR recording, the Court will allow counsel to argue and may reconsider this ruling.

### III. Conclusion

For the reasons explained above it is hereby

ORDERED that Defendants' Motion for Judgment of Acquittal and in the Alternative for New Trial, Doc. 109, is denied.

DATED this 18th day of January, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE